Good morning, Your Honor. My name is Trevor Uffelman from Helena, Montana, representing the Montana Department of Public Health and Human Services, and I, with the Court's consent, would like to reserve three minutes for rebuttal. I find this to be a very confusing case, and in terms of for several reasons. You have the statute that's got an A, B, and C, right? Correct. And on summary judgment, the judge found that the plaintiff could not go forward, correct? Correct. Because the department had shown good cause, right? Correct. However, the district court allowed then the case to go forward on... Go forward on A and C. Correct. Now, we don't have any Montana case law that says, okay, so that means that basically good cause can defeat wrongful termination, but the implication seems to be from that that good cause doesn't defeat retaliation, and I think it's public policy or something on C, right? Correct. And so then it goes to trial, and then the jury finds retaliation, and so based on that statute, if it's got A, B, and C, it would seem to be that I can go from there to say that retaliation is a separate cause of action from what's alleged in B, the wrongful termination, right? That could be one possible result, yes. Well, we don't have, and we don't have any case law from Montana that says that just because there's good cause that that defeats A and C. There's nothing out there that says that. That's correct, Your Honor. All right, and so then it goes to the jury, and then the department wants certain instructions on how to, you know, what does good cause mean relative to retaliation, and the court doesn't give anything, and so, because the court says that, well, I mean, from that, can I infer that the court is saying that good cause does not defeat retaliation in public policy? Correct. The instruction argument that we had, we asked for a mixed motive. Well, if the, let's see, if the Montana Supreme Court had said in some decision that we could define that good cause defeats retaliation in public policy, then that would be the end of it, right? Yes, that would be true, and that question actually. But obviously, the district judge didn't find that, because the district judge said, no, you have shown good, the department has shown good cause, but retaliation in public policy can still go forward, and I couldn't find any, I can't define what Montana would do about how does good cause factor into retaliation in public policy. I don't know if anybody can, honestly, Your Honor, and that specific question that you've, you know, focused in on. But how do I resolve this case if I don't know the answers to that? Because if, in fact, good cause does bear upon retaliation in public policy, then it would seem that the jury would have to know how to factor it in, and the jury never got anything on that, right? That's correct. So I would say that would be the exact answer. And if Montana would say that good cause defeats all of that, then you don't, you know, then you don't need an instruction, and the jury wouldn't have needed something. So I, you know, how do we resolve this? And what was the district court doing? The question about whether, if we prevail on the good cause prong of the wrongful discharge statute has been specifically reserved by the Montana Supreme Court in the Ritchie case, which was cited in the briefs. So I think, honestly, the path forward here is probably certification to the Montana Supreme Court to have the question answered as a matter of state law. I mean, we're really here arguing about whether, how these three prongs interact with one another, and that is really the crux of this. Let me just, I have several questions for you, but I'd like to follow up on something that Judge Callahan has been raising with you. So if you assume for a moment that each of these three provisions in the statute are separate, independent causes of action, that does not mean that when she goes forward on a retaliation claim that the defendant, in your case, the department here, could not offer some reason why they terminated her, correct? Correct. And as far as I'm aware, Your Honor, we do not. The department can get up and tell its version, its story about what happened, right? That's true. And so you get up there and tell the story, well, the reason why we let her go, somebody gets up there, some representative from the agency, and says, we let her go because she was identified as a troublemaker by the feds in their report. And they're going to pull all their money. That's the reason why we let her go, right? Right. That's true. And we argue that. So if you have a retaliation claim, you can get up and offer an explanation. Absolutely. And we did. The second part of it. That doesn't mean. So I have a hard time, as I think the district court did, is have a hard time accepting the idea that just because you prevailed on B, that that precludes, as Judge Callahan was alluding, A or C. It doesn't preclude it, but it doesn't also prevent you from getting up and offering your story about what happened here. True. And we did that. And the argument, of course, that we made was that it should trigger some sort of a mixed motive or burden-shifting analysis. Well, if the jury had believed that the reason you fired her was because the feds were threatening to pull all, you know, I mean, there were a number of things that were alleged against her. Some improper behavior with clients, that there's this letter from the feds that says, if you don't get rid of this woman, you know, we're going to pull all the funding. And that would be, if the jury believed that that's the reason you terminated her, that could mean that they wouldn't, that you didn't retaliate. But they could also believe that, you know, that may be part of the reason that you did terminate her for that reason, but you can still retaliate. So it's hard to. That's one issue, of course, that, you know, and I think that's why a mixed motive instruction would have been helpful in this case. But the second part of this. But what law is there out there to say that that's what you do, too? I mean, in California, it would have been easier. Yes. And in Montana, the question is, as you have noted, unanswered. And I can't divine what the answer might be. I think what the court, Montana Supreme Court, would do based on what it's done in cases sort of arising under Montana's version of the Title VII framework is to apply a burden-shifting analysis. Well, I mean, regularly in California that juries come back that they say, well, the person brings a lawsuit saying you discriminated against me and you retaliated against me. And the jury finds, no, they didn't discriminate against you, but they did retaliate against you and they prevail on the retaliation. But we don't know in Montana. We don't. That's why I think certification is important. If you're recommending certification. That would be my recommendation. And what's the likelihood in Montana that the Supreme Court, having reserved the issue, would find this case the one to give us guidance, aside from the fear of the Ninth Circuit taking Montana law? I think if there's the question, would the Montana Supreme Court answer the question if certified? Yes. I think there's 100 percent chance that they would after briefing. What issue would you pose to them? Whether or not, if you have a finding of good cause, which we had here at the summary judgment stage, whether or not then you can also prevail under Section A or B under the wrongful discharge statute. So whether, if you have good cause, does that end the inquiry or is there something more that has to occur? Do we need to do a mixed motive analysis under the McDonnell-Douglas framework? It sounds like two questions in. Yes. Well, she didn't go to the jury on B, though, did she? You won on summary judgment on Subsection B, right? Yes. So that wasn't A or C is what you want to say. Yes. Not B. I was confused about the order in which they appear in the statute. But basically, the retaliation problem we're saying is foreclosed by the determination at the summary judgment level that good cause exists to determine. So then if the Montana Supreme Court wouldn't take it, then you're saying you should prevail because the fact that you prevailed on B, good cause is a total defense to retaliation in public policy? That would be our argument. But the second argument is that the district court erred in the jury instruction stage. So Montana defines public policy very specifically. It has to be an administrative rule, a statute, or a court decision that affects the public health, safety, and welfare. So in the Montana pattern jury instructions, there's the jury instruction that sort of lays out what the statute says, and then there's a second jury instruction that comes after it, and this is laid out in my reply brief, that basically says, and the public policy that you, the jurors, are to consider is spelled out here. Judge Christensen rejected the jury instructions proposed by the plaintiff in this case, which they contended said the public policy that was at issue. Now, our argument to that was that the statute was really a funding statute. It had nothing to do with Ms. Leith's ability to report or act in any particular way. But basically, she didn't feel that the clients were getting the services that they were entitled to, right? Yeah, and it was really one specific client. She thought that the decision to place the client on line-of-sight supervision versus a more direct care was erroneous, and that's where the whole issue sort of erupted that caught, which brings us here today. Can I take you back to this preclusion argument that you made about having a summary judgment you prevailed on the good cause? Of course. When did you actually really raise that argument before the district court? Did you raise it in your summary judgment motion? No, because at that time, we were at the time of the summary judgment motion, we were operating on the assumption that once we prevailed on good cause, that would pretty much be the end of that particular claim. So you didn't make that argument in your, at least I didn't see it, so you're right. No, no. Okay, so then you moved to trial, and you filed the trial brief, correct? We did. And you raised it in the trial brief. We raised it. And you suggested to Judge Christensen that, well, maybe you want to invite briefing on this, and maybe you should do like another summary judgment on this. That's correct. And he said no. He said no. Too late. We're going to trial. Basically, that was his response. I actually think he says that in the transcript. Well, I don't know what he says, but that's essentially what he said, right? Yes. We're too close to trial. And then we raised it again. Then you raised it on a 50A. Correct. And he said no. He said no again. And then you raised it at the end of the plaintiff's case, or you raised the 50A again, and you said we're making it on the same motion, the same basis. After the defense closed. Correct. And he said no. He said no again. But you didn't file a 50B. We did not file a 50B motion. That's correct, Your Honor. So doesn't that foreclose that argument again? Not the way I read the Rule 50B line of cases. So if the challenge here were to the sufficiency of the evidence or that the plaintiff didn't put evidence on a trial that support the claims, something like that, yes, I would say that the cases under Rule 50B would foreclose that. But as I read the cases, including the ones we cited in the reply brief, for purely legal issues it is inherently the province of the appellate courts to be able to answer those and to determine, in this case, whether the instructional errors were correct, I guess as the second component of the argument. Well, tell me how you argued this case. So you put evidence on of why you fired her, right? Correct. So you put all that evidence on anyway, even though she didn't have a wrongful termination claim against you. And when you argued the case, what did you argue? Did you argue, well, look, we had all these reasons for terminating her so we couldn't have retaliated against her? Yes. In addition to that, we had all kinds of reasons before the act. So, you know, the act from which she arises claims that retaliation arose, you know, occurred after a huge string of disciplinary actions had already happened. So it's hard to understand exactly how a jury reaches this conclusion, but in our view it was a mountain of evidence. What are the elements of retaliation? So in Montana, the elements of retaliation are that she had to refuse to violate a public policy or I'm stumped on the second one. It's not coming to me. She basically has to refuse to violate a public policy or file a complaint about the department's violation of a public policy, which goes to the second issue, which was never defined in the case. Well, what did they argue the retaliation was? Did they argue the retaliation was her firing? That would be it, yeah, and the discipline that occurred after she made the complaint about the one client. Which was not firing. Pardon? Which was not. So, I mean, essentially all the evidence is out there and the jury actually just believed. I mean, can't I infer from the verdict that they didn't believe that you had good reasons for what you did and they did believe that she satisfied the elements of retaliation and public policy? I don't think you can infer that in this case, Your Honor, because the instructions were so mangled by the time they got to the court. Well, if they had believed you. The jury needs to know what retaliation means. If they had believed you, the case that you put on and the way that you argued it, you would have won, right? Theoretically. Because, well, I'm just trying to. It doesn't sound like the evidence would have been any different regardless. You all put it all out there. I would generally agree with that, yes. So, but so if the instructions from your perspective had been correct, then they might have factored in your reasons. Correct. So it's really an instructional error argument fundamentally. But I find it hard to believe a jury wasn't thinking about if they had believed that you had really good reasons to fire her, that therefore you didn't retaliate against her, they wouldn't have come back with this verdict under even the instructions that were given. That could very well be, Your Honor. And the instructions you proffered were based on but-for causation? The instructions we proffered on the retaliation issue were really modeled on the Ninth Circuit's sort of, the model instructions that the Ninth Circuit has on mixed motives or the McDonnell-Douglas analysis on the retaliation issue. And I'm out of time. Yes. I'll give you a minute for rebuttal. Thank you. Can you look up the elements of retaliation before you come back up? I will. Thanks. Good morning. If it pleases the Court, I am Frederick Sherwood for the appellee, Elizabeth Pritchard Sleeth. In the transcript, she's usually referred to as Libby Sleeth. She was fired by the Department in 2011. There was a five-day jury trial in 2014. The jury came back with a resounding verdict for my client. The appellant is now challenging that verdict. In doing so, they have not cited a single bit of trial testimony to this tribunal or a single exhibit that was in evidence. You did not challenge the finding on the for cause, right? You lost at summership. Lost at summary judgment. Went forward on the retaliation and the public policy one. Yes, Your Honor. But you don't have a, what do they call them, a prophylactic appeal challenging the for cause finding. We don't need to, Your Honor. Since we're not asking the Court to do anything other than to confirm the verdict and the judgment, we're not asking for, we can still disagree about the good cause ruling without having to do a cross appeal. But the point, I think, is, and I'm certainly willing to talk about state law, but this Court does not have to certify any question to the Montana Supreme Court because this case can be decided entirely according to the federal rules of civil procedure. As the Court has noted, there was no 50B motion filed, so unquestionably the appellant cannot seek redress under Rule 50. Concerning the jury instructions, they cannot seek redress about any instruction other than what the Court gave concerning retaliation because they offered no instruction. Furthermore, they did. I'm speaking of a different part, but I will address the Court's mixed motive question. It seems they were trying to get at the point. Now, how artfully they did it, but it seems that they were trying to get at the point that if we have good reasons to fire someone, which you found, which the Court found in the summary judgment, we should be able to ask the jury to determine did we fire her because we were retaliating or did we fire her because of the reasons that were good. And that's exactly the argument they made to the jury. But they had no instruction to tell the jury what do you do with it. I mean, like in California, they would probably give a mixed motive or something. Well, this isn't a discrimination case, and that's where the mixed motive instructions come from. Now, what the jury was given was something even better for the defendant. The jury verdict and instruction said, ask the jury, did plaintiff prove by a preponderance of the evidence that she was fired in violation of the Wrongful Discharge Act? If so, go to question B. Did the plaintiff prove by a preponderance of the evidence that she suffered damages as a result? So the burden of proof was kept on the plaintiff and the defendant. Okay. But so were you alleging wrongful discharge at the trial or just retaliation in public policy? Your Honor, wrongful. At the summary judgment, what does it do? Yeah. Well, I'd like to be able to get to that in just a minute. Under the Montana Wrongful Discharge Act, there are three prongs, and proving any one of them proves a violation of the Wrongful Discharge Act. Okay. Retaliation is one of the prongs. But my point on the mixed motive is they could argue to the jury, and they did, that, hey, regardless of whether there was any retaliation or not, she should have been fired anyway because she broke all these policies. She didn't suffer any damages from that. That was the jury was instructed in that manner. That's even better for a defendant than a mixed motive instruction. As the Court knows, in discrimination law, a mixed motive instruction will transfer the burden of proof to the employer that, along the lines of, well, if you find gender discrimination, for example, as in Price Waterhouse, but the employer proves they would have made the same decision anyway, then they can escape liability for damages. The defendant got at least as good an instruction, a verdict form here as the How did that summary judgment limit you in the arguments that you could make? It kept us from alleging that she was fired in violation of good cause, and there's a particular statutory definition of good cause. It did not limit us, and the district judge specifically said this, it did not limit us from arguing firing in violation of the retaliation provision or firing in violation of the employer's own written personnel policies, which I think seems to be an argument that the appellant is no longer pursuing, at least in its brief. Let me just – I want to just make sure I understand your argument. So at the trial, when they got a chance to put on their case, they offered an explanation for why she was fired, correct? Yes, Your Honor. Okay. So now when the judge gave the jury instructions and the verdict form, how did he guide them, or did he offer any guidance to them in how to evaluate the department's reasons? Well, the instruction was that the plaintiff has the burden of proof, and if she hasn't convinced you that they fired her because of her contacts, her retaliation, which in this particular case would be contacts with Disability Rights Montana, or if she hasn't convinced you that she was fired in violation of their personnel policies, then the defendant wins. But we convinced the jury, perhaps because the defendant didn't put on key witnesses for whatever tactical reason, such as this Superintendent Zeke, who was the person who was alleged by – So essentially what you're saying is that the only reason why she was fired was because she was retaliated against. There was extensive evidence put on as to comments by management at MDC about, you better quit bringing DRM into this. This is our fight. Quit being a troublemaker. There was all sorts of those comments made to her. Did they put in the evidence of that, hey, look, we got this letter from the federal government saying if we don't do something about you, we're going to lose all our funds? Yes. That was extensively discussed, and I'm glad you brought that up because it's a very interesting part of this case. In August, Libby, August of 2010, Libby was accused of trying to incite a client to run away from the MDC, the institution, and go live with her. This is a statement the client made, and the client, you know, bless him, he's a very limited person with fixed delusions. Libby vehemently denied that and at the trial put on a lot of evidence as to why that was not so, and the jury got to listen to a tape recording of the client and so forth. They got to see the evidence that the person who decided that, yes, Libby actually did this was Catherine Zeek, Superintendent Zeek, who had also made all these comments to Libby and to her predecessor that people who contact DRM aren't going to work here for long. So, anyway, Catherine Zeek says Libby did this. She tried to induce a client to run away with her. For this, she gets a three-day suspension. The feds come next spring, CMS, and they say, a three-day suspension? Are you crazy? If somebody did that, induce the client to run away with them, then they can't work here anymore. And, therefore, she doesn't work here anymore. And the curious thing also that I think was of interest to the jury is in May of 2011, the institution, the department, doesn't tell her, doesn't tell Libby, oh, we're going to fire you now for the other thing you were punished for last August. They give her a whole new list of bogus reasons why they're firing her, A, B, and C. She shows that these are bogus reasons, that she never did these things. And yet, as the jury heard at the trial, they'd already decided prior to making this alleged decision on A, B, and C, they'd already decided to fire her because of their funding problem with CMS. So, really, what happened is Libby's career was wounded through retaliation back in August of 2010, and it died in May of 2011 because of that retaliation, because of that wound that was imposed on her because she was intending to comply with what she saw as the provisions for DRM. So, as part of the case, you presented evidence fighting this situation with the special needs client. Yes. Okay. And they said, no, she did that. Yes, Your Honor. And so, if the jury had believed that she did do that. She should have been out the door. The jury didn't believe it. And did they argue, were all these things, is that basically how the case was argued? Yes, Your Honor. It was a five-day trial, and there was a lot of evidence from different people. As I say. So, tell me the elements of retaliation again. Either for refusing to violate public policy or complaining about a violation of public policy. So, the gist of your case was that she was complaining because the clients weren't getting what they should. And what was the public policy argument? She was complaining about MDC's failure to use DRM, which is a protection and advocacy system that is set up by law, by federal law, that all states have to have these. And everybody agrees that they have to have access to the clients, and they're supposed to be advocates for the clients. Libby believed that. And so she was using DRM, for example, to get a woman who was sexually assaulted, you know, better treatment, to get closer supervision of a client who was a cutter and was in danger of cutting himself that weekend. And they resented that. Her superiors resented the additional money that it cost them. They resented the additional trouble it caused them. They resented having somebody looking over their shoulder with DRM. And so that's the public policy. Now, there's a very interesting case. The important case is Fennel v. Mountain West Bank as far as state law is concerned. And it meant in that case there was no ‑‑ there was not a good cause element because that was preempted by federal law. But ‑‑ Well, what is Montana law about how good cause is to be factored into A and C? What is Montana law on that? What do we have? What we have is a large number of cases that say there's three separate prongs and you can look at any of them. We don't have a specific case where there was good cause. Good cause was not found, but retaliation was allowed to go forward. But in the Fennel case, because of preemption, good cause was not allowed. But retaliation could go forward. Let's just say, I think, hypothetically, that the judge was wrong in not giving something on mixed motive. Is that error harmless or is it prejudicial? Well, it's certainly harmless and it's certainly not prejudicial and it's certainly not an error. Well, why is it harmless? Why is it harmless? Because they actually got a better deal with the instructions they got. And abuse of discretion, as you know, is the standard, and he certainly didn't abuse his discretion to refuse that instruction. Furthermore, and the ---- But there's nothing in Montana law that really supported that instruction at the time. That's correct. Nobody could point to a case or a statute or anything. They tried to use a regulation of the Human Rights Commission, which doesn't enforce this law, and that even misstated the regulation because it didn't talk about a shifting burden of proof. Finally, I would say, as I note in the brief, they can't appeal instructions because we talked about mixed motive. They challenged another instruction, but they agreed to that instruction, the one that went to retaliation. They didn't object to it. In fact, they stipulated to it. It was a general instruction. The plaintiff offered additional instructions to talk about the laws at question. They objected to those additional instructions. The Court refused to give it. The instruction went to the jury with or that issue went to the jury with an instruction both parties had agreed with. I think it was instruction 12. I see. You're over your time. Thank you, Your Honor. Thank you. You have a minute to rebut. Thank you, Your Honor. Judge Callahan, did you want me to address the retaliation? I think I've ironed that out. But let's just assume since there wasn't any Montana law out there on mixed motive or whatever, why did the Court abuse its discretion? And I'm not giving it. And then, really, it sounds like all the evidence came before the jury, and essentially they believed Appellee's side of the story and not your side of the story. So how is it? Why is the error? If there was an error, why is it not harmless? The error is not harmless, for one thing, because there never was a public policy instruction to the jury that explained to the jury what exact public policy she was retaliated against for violating. And so this kind of addresses the final argument that Mr. Sherwood made, which is that. . . Well, but he argued what the public policy was. And are you saying as a matter of law that wasn't a public policy? Yes, that's exactly what we argued. And Judge Christensen agreed that it wasn't a public policy that could be put into an instruction that was offered by the plaintiff. So then why didn't she win as a matter of law on that? We should have. I mean, I think at that point, that's where, with the good cause finding, the case should have been over. With the inability to identify the public policy that she had claimed we had violated or that she was complaining of a violation of, that instruction was really critical for the jury to understand and to be able to sift the evidence in a way that made any rational sense. Wasn't the jury informed that there was disability rights Montana, that it existed and existed pursuant to state law and whatnot? I couldn't say that they knew. Certainly DRM witnesses were part of the trial. I don't know to what extent the jury knew that DRM was this agency that existed so that we could get funding. Well, it does exist under Montana state law, correct? Pardon? It does exist under Montana law. It actually exists under federal law. So it's a requirement to have these protection and advocacy organizations under federal law for the state institutions to receive Medicaid funding. Does the state fund them? No. The federal government provides the funds. So they actually work for the state, but the federal government funds the whole entire program. They're state employees, though, aren't they? Somehow they're affiliated with the state. They're independent. It's a private, I think it's a 501C3, honestly. And so DRM is just certified by the Department of, the Federal Department of Health and Human Services to do this sort of, it's an outside, sort of like an ombudsman. Does public policy extend to policies that are established by the federal government? Pardon? Does Montana public policies extend to policies that are established by the federal government? Under the definition of public policy in the wrongful discharge statute, I think it would. However, the statute that creates the protection and advocacy organization, like DRM, does not imbue a person like Ms. Sleeth with any particular rights, nor does it really establish a public policy. It really is, you have to have this organization. Was she trying to further the purposes of protection and advocacy by what she was doing, trying to solicit their help in dealing with clients who she thought had been misbehaved? That is certainly what she would argue she was doing, yes. Well, I mean, it's not a hard argument. Thank you. Thank you, Your Honor. Thank you. Matter submitted. Thank you, counsel. Appreciate your arguments. Thank you, Your Honor.
judges: Fisher, Paez, Callahan